**LEVI & KORSINSKY, LLP**
Adam C. McCall (SBN 302130)
amccall@zlk.com
445 S. Figueroa St., 31st Floor
Los Angeles, CA 90071
Tel:   (213) 985-7290

Nicholas I. Porritt
nporritt@zlk.com
Adam M. Apton
aapton@zlk.com
Julia Sun
jsun@zlk.com
Michael B. Ershowsky
mershowsky@zlk.com
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel:   (202) 524-4290
Fax:   (202) 333-2121

*Attorneys for Plaintiff Patrick A. Griggs*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK A. GRIGGS, Individually and On Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>      v.<br><br>VITAL THERAPIES, INC., TERRY WINTERS, and MICHAEL V. SWANSON,<br><br>            Defendants. | No. **'15CV2700 JLS  NLS**<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>Demand for Jury Trial</u> |

Plaintiff Patrick A. Griggs ("Plaintiff"), by his counsel, hereby alleges the following upon personal knowledge as to itself and its transactions in Vital

Therapies, Inc. stock, and upon information and belief as to all else, based upon the investigation of counsel, including the review and analysis of Defendants' filings with the United States Securities and Exchange Commission (the "SEC"), news articles, and analyst reports:

## NATURE OF THE CLAIM

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Vital Therapies, Inc. ("Vital Therapies" or the "Company") between April 17, 2014 through August 21, 2015, inclusive (the "Class Period"), against Vital Therapies and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78a, *et seq*.

2. Throughout the Class Period, the defendants misrepresented material facts and/or misled investors about the interconnection between Vital Therapies' three clinical trials, the independent significance of each clinical trial, and the potential effects of the failure of one of the Company's clinical trials on the others. When the truth finally emerged, the trading price of the Company's stock plummeted, resulting in significant losses to Plaintiff and the members of the proposed class.

## JURISDICTION AND VENUE

3. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act.

5. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render

the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because Vital Therapies is headquartered in this District. Furthermore, at all times relevant to this action, many of the acts and transactions alleged herein occurred in substantial part in this District.

**THE PARTIES**

7. Plaintiff purchased Vital Therapies' common stock as set forth herein and in the certification filed herewith.

8. Defendant Vital Therapies is a Delaware corporation with its principal place of business located at 15010 Avenue of Science, Suite 200, San Diego, California 92128. Vital Therapies' common stock trades on the NASDAQGS stock market ("NASDAQ") under the ticker symbol "VTL."

9. Defendant Terry Winters ("Winters") has been Co-Chairman and Chief Executive Officer of the Company since June 2003.

10. Defendant Michael V. Swanson ("Swanson") has been Chief Financial Officer of Vital Therapies since August 2013.

11. Defendants Winters and Swanson are collectively referred to hereinafter as the "Individual Defendants."

12. Defendants Vital Therapies and the Individual Defendants are collectively referred to hereinafter as the "Defendants."

**CONTROL PERSON ALLEGATIONS**

13. The Individual Defendants, because of their positions with the Company as executive officers (and in Winters's case, as a director), possessed the power and authority to control the contents of Vital Therapies' filings, reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the

3

Company's filings, reports, and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## **FURTHER SUBSTANTIVE ALLEGATIONS**

14. Vital Therapies is a biotherapeutic company focused on developing a cell-based system for the treatment of liver failure. The Company has developed a product candidate, the ELAD System, which is an extracorporeal human allogeneic cellular liver treatment designed with the proposed intent to allow the patient's own liver to regenerate to a healthy state, or to stabilize the patient until liver transplant.

15. The ELAD System incorporates human liver-derived cells, or VTL C3A cells, contained in four hollow fiber cartridges that are combined with single-use customized disposable sets and an ancillary delivery system. The ELAD System is the only liver support system containing human liver-derived cells to enter Phase III clinical trials. During the Class Period, Vital Therapies conducted three clinical trials.

16. The Company's leading study was called VTI-208. The VTI-208 trial was a Phase 3 trial initiated in March 2013. The purpose of the VTI-208 trial was to study the ELAD System's benefits to patients suffering from alcohol-induced liver decompensation ("AILD"). Vital Therapies completed enrollment in VTI-208 in January 2015.

17. The Company's other Phase 3 trial was called VTI-210. VTI-210 was designed to study the ELAD System's benefits to patients suffering from severe acute alcoholic hepatitis ("SAAH").

18. The Company also conducted a Phase 2/3 trial called VTI-212. VTI-212 enrolled subjects with either fulminant hepatic failure ("FHF") or surgery-induced acute liver failure ("SILF").

## **The Material Misrepresentations and Omissions**

19. The Class Period begins on April 17, 2014, the first day that Vital Therapies common stock traded publicly.

20. Prior to the beginning of the Class Period, Vital Therapies filed a Registration Statement on Form S-1 with the SEC, the final version of which was filed on April 9, 2014 (the "Registration Statement"). The Registration Statement asserted the following regarding VTI-208 and VTI-210:

> We are currently enrolling patients in one Phase 3 clinical trial, and have regulatory allowance to begin enrolling patients in a second Phase 3 trial, each in forms of acute liver failure. In March 2013, we initiated VTI-208, a Phase 3 randomized, controlled clinical trial in 200 subjects with AILD. In addition, we have obtained regulatory allowance in the United States, United Kingdom, Spain and Australia to begin enrolling patients and have initiated clinical sites in a second Phase 3 randomized, controlled clinical trial, VTI-210, in 120 subjects with severe AAH, which is a subset of AILD. We expect the enrollment of subjects in VIT-210 to begin in the first half of 2014.
>
> These studies are designed to complement each other and confirm study outcomes, and may be combined to support product registration in the United States and the European Union, or E.U. In addition, based upon discussions with United States and European regulatory authorities, we believe the VTI-208 and VTI-210 clinical trials, if successful from both a statistical and clinical standpoint, may support product registration on a stand-alone basis. According to the FDA, a second confirmatory clinical trial that substantiates positive results may be necessary to support a Biologics License Application, or BLA. EMA has informed us that the VTI-210 trial, if deemed successful, will be sufficient to support product registration in the E.U. We designed VTI-208 with input from the FDA to support product registration in the United States. Similarly, we designed VTI-201 with input from the EMA to support product registration in Europe. We

currently anticipate having Phase 3 clinical trial data from VTI-208 in the first half of 2015.

21. The Registration Statement also discussed the Company's commercial goals:

> *Obtain regulatory approval for the ELAD System in the United States and Europe.* If our VTI-208 or VTI-210 Phase 3 clinical trials are statistically and clinically successful, we plan to submit a BLA to the FDA and a Marketing Authorization Application, or an MAA, to the EMA, in 2016 for the indications of AILD and AAH, respectively. If the Phase 2 and or Phase 3 component of VTI-212 provides compelling evidence of the safety and efficacy of the ELAD System in FHF and SILF we plan to seek agreement from the regulatory authorities regarding the next steps to be taken in order to enable marketing authorization, which may or may not involve an additional randomized controlled Phase 3 clinical trial either prior to or after contingent marketing approval.

22. The Registration Statement was signed by Defendants Winters and Swanson.

23. On March 20, 2015, Vital Therapies filed an Annual Report on Form 10-K with the SEC (the "10-K"). Like the Registration Statement, the 10-K included information about the Company's studies and commercial goals:

> The VTI-208 and VTI-210 clinical studies are designed to complement each other and to confirm study outcomes, and the studies may both be used to support product registration in the U.S. and the European Union, or EU. We designed VTI-208 with input from the FDA to support product registration in the U.S. In addition, based upon discussions with the FDA, we believe the VTI-208 clinical study, if successful from both a statistical and clinical standpoint, may support product registration in the U.S. on a stand-alone basis. However, according to the FDA, a second confirmatory clinical trial that substantiates positive results may be necessary to support a BLA. Similarly, we designed VTI-210 with input from the EMA to support product registration in the EU. Based upon our discussions with the European regulatory authority, including communications with SAWP regarding subsequent modifications to the study protocol, we also believe VTI-210 may support on a stand-alone basis, if successful from both a statistical and clinical standpoint, product registration in the EU.
>
> We have also enrolled four subjects in VTI-212, an open-label Phase 2 study that is part of a Phase 2/3 clinical program in subjects with either fulminant hepatic failure or surgery-induced acute liver failure. We are beginning this program with a Phase 2

single-arm component enrolling 40 subjects, which may later be followed by a randomized, controlled Phase 3 component. Results from the single-arm component will be compared with historical or case-matched controls, and we currently anticipate Phase 2 data in 2016. Since FHF and SILF have high mortality rates and affect a very small number of patients for which there is currently no satisfactory therapeutic intervention available, the results from the Phase 2 single-arm component may provide support for an expedited regulatory approval pathway. However, regulatory agreement on an expedited regulatory pathway has not yet been sought and may never be granted. In the event that randomized or other Phase 3 data are necessary for approval in FHF and SILF, we expect to perform a randomized Phase 3 trial, the design of which would be finalized upon analysis of the Phase 2 component. Data from VTI-212 may also be used to support our planned marketing applications for AILD and SAAH.

*\*\*\**

*Obtain regulatory approval for the ELAD System in the U.S. and Europe*. If our VTI-208 or VTI-210 Phase 3 clinical trials are statistically and clinically successful, we plan to submit a BLA to the FDA, and a Marketing Authorization Application, or an MAA, to the EMA, in 2016 or 2017 for the indications of AILD and SAAH, respectively. If the Phase 2 component of VTI-212 provides compelling evidence of the safety and efficacy of the ELAD System in FHF and SILF, we plan to seek agreement from the regulatory authorities regarding the next steps to be taken in order to enable marketing authorization, which may or may not involve an additional randomized controlled Phase 3 clinical trial either prior to or after contingent marketing approval.

24. The 10-K also described Vital Therapies' contingency plans for a failure of the VTI-208 trial: "If the VTI-208 clinical trial results do not support the filing of a BLA, we expect to focus on conserving cash in order to enable completion of the VTI-210 clinical trial."

25. The 10-K also discussed the importance of the VTI-212 study, stating that because "FHF and SILF have high mortality rates and affect a very small number of patients for which there is currently no satisfactory therapeutic intervention available, the results from the Phase 2 single-arm component [could] provide support for an expedited regulatory approval pathway."

26. In addition, the 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Winters and Swanson, who certified:

7

1. I have reviewed this Annual Report on Form 10-K for the fiscal year ended December 31, 2014 of Vital Therapies, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> a) Al significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

27. The 10-K contained further signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Winters and Swanson, who certified:

> 1. the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2. the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

28. Then, on May 15, 2015, the Company issued a press release announcing its financial results for the first quarter of 2015. In the press release, Defendant Livingston stated,

> The first quarter is off-season for our business so the results of the period reflect costs of ongoing operations with little revenue. As a result of restructuring over the last year, current quarter operating expenditures are down 30 percent year-over-year. Our balance sheet is strong with $78.6 million in total cash and deployable cash of $31.7 million at March 31, 2015. Deployable cash is up $16.7 million over this time last year. The increase largely stems from the sale of our corporate headquarters building and BookRags, as well as from our operating expenditure reductions.

29. On May 12, 2015, Vital Therapies filed a Quarterly Report on Form 10-Q with the SEC (the "May 10-Q"). The May 10-Q reiterated the Company's stated plans for conducting its business if the VTI-208 trial were unsuccessful: "If the VTI-208 clinical trial results do not support the filing of a BLA, we expect to focus on conserving cash in order to enable completion of the VTI-210 clinical trial."

30. The May 10-Q included SOX certifications substantially identical to those contained in the 10-K signed by Defendants Winters and Swanson.

9

31.     On August 6, 2015, Vital Therapies filed a Quarterly Report on Form 10-Q with the SEC (the "August 10-Q"). The August 10-Q reiterated the Company's stated plans for conducting its business if the VTI-208 trial were unsuccessful: "If the VTI-208 clinical trial results do not support the filing of a BLA, we expect to focus on conserving cash in order to enable completion of the VTI-210 clinical trial."

32.     The August 10-Q also included SOX certifications substantially identical to those contained in Vital Therapies' 10-K signed by Defendants Winters and Swanson.

33.     The statements referenced in ¶¶ 20-32 above were materially false and/or misleading because they misrepresented and failed to disclose the adverse fact, which was known to Defendants or recklessly disregarded by them, that (a) each of the VTI-208, VTI-210, and VTI-212 trial was of stand-alone significance; (b) the VTI-208, VTI-210, and VTI-212 studies were interrelated to the point that the failure of the VTI-208 study would result in the cessation of the VTI-210 and VTI-212 studies; and (c) in the case of the failure of the VTI-208 trial, the Company would not conserve cash in order to continue the VTI-210 trial.

**THE TRUTH IS REVEALED**

34.     On August 21, 2015, after the market closed, the Company issued a press release announcing that the VTI-208 trial "failed to meet the primary endpoint of overall survival through at least 91 days[.]" The press release also announced that "[t]he Company will stop the VTI-210 and VTI-212 clinical trials, and also plans to meet with the FDA as soon as possible to discuss restructuring its clinical development program, including a potential new trial to confirm the information suggested by the subset analyses."

35. On the same day, the Company held a conference call to discuss the VTI-208 results and the future of Vital Therapies.[1] During the call, Defendant Winters explained that the Company's other trials would be stopped to conserve cash for a new trial. When asked when the VTI-210 and VTI-212 trials would be restarted, Winters refused to give a time frame.

36. As a result of this news, the trading price of Vital Therapies common stock plunged 73.4% from its August 21, 2015 closing price of $17.68 per share to close at $3.65 per share on August 24, 2015, the next trading day.

## LOSS CAUSATION

37. During the Class Period, as detailed herein, the Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the trading price of Vital Therapies' common stock and operated as a fraud or deceit on Class Period purchasers of Vital Therapies common stock by materially misleading the investing public. Later, when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the trading price of Vital Therapies common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Vital Therapies' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## FRAUD-ON-THE-MARKET DOCTRINE

38. At all relevant times, the market for Vital Therapies' common stock was an efficient market for the following reasons, among others:

---

[1] Available at http://edge.media-server.com/m/p/vqthdvoz (accessed on October 30, 2015).

11

(a) Vital Therapies common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) Vital Therapies filed periodic public reports with the SEC and NASDAQ; and

(c) Vital Therapies regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

39. As a result of the foregoing, the market for Vital Therapies' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Vital Therapies common stock during the Class Period suffered similar injury through their purchase of Company stock at artificially inflated prices and a presumption of reliance applies.

## **NO SAFE HARBOR**

40. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants

are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Vital Therapies who knew that the statement was false when made.

## **CLASS ACTION ALLEGATIONS**

41. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Vital Therapies common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

42. The members of the Class are so numerous that joinder of all members is impracticable, since Vital Therapies has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ. As of October 31, 2015, Vital Therapies had more than 30 million shares issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

43. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class and Private Placement Class members include:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants omitted and/or misrepresented material facts in their publicly disseminated press releases and statements during the Class Period;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f) whether the price of Vital Therapies common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of Vital Therapies' stock when the truth was revealed, and if so, what is the appropriate measure of damages.

44. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

45. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

46. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

# COUNT I

**Against All Defendants for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
(on behalf of the Class)**

47. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

48. This Count is asserted by Plaintiffs on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

49. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Vital Therapies' common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Vital Therapies' common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

50. Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Vital Therapies' common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

51. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants

had a duty promptly to disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

52. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

53. As a result of Defendants' fraudulent activity, the market price of Vital Therapies' common stock was artificially inflated during the Class Period.

54. In ignorance of the true consequences of a failure of the VTI-208 trial, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Vital Therapies containing the misleading information, purchased or otherwise acquired Vital Therapies' common stock at artificially inflated prices during the Class Period.

55. Plaintiff's and the Class's losses were proximately caused by Defendants' active and primary participation in Vital Therapies' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Vital Therapies stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Vital Therapies' common stock through their misconduct as described

herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true consequences of VTI-208's failure.

56. Throughout the Class Period, Defendants were aware of material non-public information concerning Vital Therapies' fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

57. As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Vital Therapies common stock during the Class Period.

## COUNT II

**Against Individual Defendants for Violation of
Section 20(a) of the Exchange Act
(on behalf of the Class)**

58. Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

59. During the Class Period, each of the Individual Defendants, as a senior executive officers and/or director of Vital Therapies, was privy to non-public information concerning the consideration of a cessation of operations and winding up of Vital Therapies' business via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and

17

other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

60. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

61. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Vital Therapies' business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Vital Therapies' corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

62. The Individual Defendants acted as controlling persons of Vital Therapies within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause Vital Therapies to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Vital Therapies and all of its employees. As alleged above, Vital Therapies is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

63. As a direct and proximate result of the wrongful conduct of Vital Therapies and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class;

B. Awarding Plaintiff and the members of the Class damages, including interest;

C. Awarding Plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 2, 2015

Respectfully submitted,

/s/ Adam C. McCall

Adam C. McCall (SBN 302130)
LEVI & KORSINSKY, LLP
Email: amccall@zlk.com
445 S. Figueroa St., 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290

-and-

Nicholas I. Porritt
nporritt@zlk.com
Adam M. Apton
aapton@zlk.com
Julia Sun
jsun@zlk.com
Michael B. Ershowsky
mershowsky@zlk.com
1101 30th Street NW, Suite 115
Washington DC, 20007
Tel: (202) 524-4290
Fax: (202) 333-2121

*Attorneys for Plaintiff Patrick A. Griggs*