1

**LEVI & KORSINSKY LLP**

2

Adam C. McCall (SBN 302130)

Email: amccall@zlk.com

3

445 South Figueroa Street, 31st Floor

4

Los Angeles, CA 90071

Tel:  (213) 985-7290

5

6

*Attorneys for Lead Plaintiff Kaktrale Austin*

*and Lead Counsel for the Class*

7

8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11

PATRICK A. GRIGGS, Individually
and On Behalf of All Others
Similarly Situated,

No.  3:15-cv-02700-JLS-NLS

12

Plaintiff,

**CLASS ACTION**

13

v.

**AMENDED COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

14

VITAL THERAPIES, INC., TERRY
WINTERS, and MICHAEL V.
SWANSON,

15

<u>Demand for Jury Trial</u>

16

Defendants.

17

18

Lead Plaintiff Kaktrale Austin ("Lead Plaintiff"), by and through his

19

undersigned counsel, brings this securities class action on behalf of himself and all

20

other persons and entities who purchased or otherwise acquired the publicly-

21

traded common stock of Vital Therapies, Inc. ("Vital Therapies" or the

22

"Company"), between April 17, 2014 and August 21, 2015, inclusive (the "Class

23

Period"), and were damaged thereby (the "Class").  Lead Plaintiff alleges that

24

defendants Vital Therapies, Terry Winters ("Winters"), and Michael V. Swanson

25

("Swanson") (collectively, "Defendants") violated the Securities Exchange Act of

26

1934 (the "Exchange Act"), 15 U.S.C. §78a, *et seq.*

27

28

## NATURE OF THE CLAIM

1.     Vital Therapies is a biopharmaceutical company focused on developing a treatment for acute forms of liver failure.  The Company has one product candidate—the ELAD System.  The ELAD System is an "extracorporeal" (outside the body) device that, in effect, is a transportable blood-filtration unit. "ELAD" stands for Extracorporeal Liver Assist Device.

2.     Vital Therapies became a publicly-traded company in April 2014.  At that time, the Company was in the midst of a Phase 3 clinical trial referred to as "VTI-208."   VTI-208 was a randomized, controlled study involving 200 study participants over 40 test sites located in the United States, Europe, and Australia. In addition to VTI-208, the Company was also enrolling patients in two other clinical studies—"VTI-210", a Phase 3 study with 120 study participants, and "VTI-212", a Phase 2/3 study with 40 study participants.  Each of the three studies was designed to test the Company's ELAD System.

3.     Throughout the Class Period, Defendants overstated the abilities of the Company and these studies to provide a path to commercialization of the ELAD System.   Repeatedly, Defendants portrayed the VTI-208 and VTI-210 studies, if successful, as each being capable of independently satisfying the U.S. Food and Drug Administration's ("FDA") requirements for submitting a Biologics License Application ("BLA") and the European Medicines Agency's ("EMA") requirements for submitting a Marketing Authorization Application ("MAA").  In either case, a BLA or MAA is the first step towards introducing a medical product to the public market.  Investors interpreted Defendants' statements as meaning that the VTI-208 and VTI-210 studies were independent of one another and that, in the case one should fail, the other could still succeed and advance the ELAD System towards commercialization without delay.

4.     This was not true.  On August 21, 2015, Vital Therapies announced that the VTI-208 study had failed to show positive results for the ELAD System.

Surprisingly, Vital Therapies also announced that, in light of VTI-208's results, the Company would also be terminating its ongoing VTI-210 and VTI-212 clinical trials.    VTI-208's results, contrary to Defendants' prior statements, completely halted Vital Therapies' progress towards commercialization of the ELAD System.

5.    Investors and analysts paid special attention to Defendants' announcement that the Company would be stopping its ongoing clinical trials. One analyst in particular, during the investor conference call in which Defendants made the announcement, asked Defendant Winters "what [had] changed based on the data . . . that makes you want to stop the 210 trial" in light of the fact that just "a few weeks ago" Winters had said he would "continue with 210" even if data from VTI-208 proved to not be "fileable."    In response to the Company's revelation, Vital Therapies' stock price declined by 73.4% from its August 21, 2015 closing price of $17.68 per share to close at $3.65 per share on August 24, 2015, the next trading day.   Vital Therapies' announcement resulted in a market capitalization loss for the Company of over $336 million in the span of just one day.

6.    Vital Therapies' VTI-208, 210, and 212 studies were not the first ELAD System studies conducted by the Company.   Between 2006 and 2011, Vital Therapies conducted at least three other studies—"VTIC-301", "VTI-201", and "VTI-206".   None of these studies yielded statistically significant positive results. Furthermore, even before commencing the VTI-208 study, the FDA expressed its view that Vital Therapies' "clinical evidence" to date "[did] not indicate that the ELAD System [would] demonstrate a substantial improvement over standard-of-care."   Moreover, the FDA had already expressed concern over "the open-label design of study VTI-208" and "issues that could significantly confound the study results, impact morbidity and mortality and cause the FDA or other regulatory authorities to require [Vital Therapies to] repeat clinical trials with different trial

3

designs." Notwithstanding the Company's numerous past failures and stated concerns from the FDA, Defendants recklessly provided investors with a false and/or materially misleading overview of the Company's ability to commercialize the ELAD System.

7. As a result of the foregoing, Defendants violated Sections 10(b) and 20(a) of the Exchange Act. Defendants are liable to Lead Plaintiff and the Vital Therapies investors he represents.

## JURISDICTION AND VENUE

8. The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District. Additionally, Vital Therapies' principal place of business is located in this District.

11. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

12. On May 2, 2016, the Court appointed Kaktrale Austin as Lead Plaintiff. Lead Plaintiff purchased Vital Therapies common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

4

13.    Defendant Vital Therapies is a Delaware corporation with its principal place of business located at 15010 Avenue of Science, Suite 200, San Diego, California 92128. Vital Therapies' common stock trades on the NASDAQGS stock market ("NASDAQ") under the ticker symbol "VTL".

14.    Defendant Terry Winters ("Winters") has been Co-Chairman and Chief Executive Officer of the Company since June 2003.

15.    Defendant Michael V. Swanson ("Swanson") has been Chief Financial Officer of Vital Therapies since August 2013.

16.    Defendants Winters and Swanson are collectively referred to hereinafter as the "Individual Defendants."

17.    Defendants Vital Therapies and the Individual Defendants are collectively referred to hereinafter as the "Defendants."

### CONTROL PERSON ALLEGATIONS

18.    The Individual Defendants, because of their positions with the Company as executive officers (and in Winters' case, as a director), possessed the power and authority to control the contents of Vital Therapies' filings, reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

19.    The Individual Defendants were provided with copies of the Company's filings, reports, and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

20.    Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

21.   As officers, directors, and/or controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial or operational condition and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information

22.   Vital Therapies is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

23.   The scienter of the Individual Defendants and other employees and agents of the Company are similarly imputed to Vital Therapies under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Background*

24.   Vital Therapies is a biotherapeutic company focused on developing a cell-based system for the treatment of liver failure. The Company has developed a product candidate, the ELAD System, which is an extracorporeal human allogeneic cellular liver treatment designed with the proposed intent to allow the patient's own liver to regenerate to a healthy state, or to stabilize the patient until liver transplant.

25.   The ELAD System incorporates human liver-derived cells, or VTL C3A cells, contained in four hollow fiber cartridges that are combined with single-use customized disposable sets and an ancillary delivery system. The ELAD System is the only liver support system containing human liver-derived cells to

6

enter Phase III clinical trials. During the Class Period, Vital Therapies conducted three clinical trials.

26.    The Company's leading study was called VTI-208. The VTI-208 trial was a Phase 3 trial initiated in March 2013. The purpose of the VTI-208 trial was to study the ELAD System's benefits to patients suffering from alcohol-induced liver decompensation ("AILD"). Vital Therapies completed enrollment in VTI-208 in January 2015.

27.    The Company's other Phase 3 trial was called VTI-210. VTI-210 was designed to study the ELAD System's benefits to patients suffering from severe acute alcoholic hepatitis ("SAAH").

28.    The Company also conducted a Phase 2/3 trial called VTI-212. VTI-212 enrolled subjects with either fulminant hepatic failure ("FHF") or surgery-induced acute liver failure ("SILF").

29.    Vital Therapies was "totally dependent upon the success of the ELAD System" in light of the fact that the ELAD System was the Company's "sole product candidate."  Vital Therapies' ability to "reach profitability" was "critically dependent" on the Company's "future success in obtaining regulatory approval for the ELAD System."

**Defendants Misrepresented the Ability to Commercialize the ELAD System**

*April 17, 2014*

30.    Vital Therapies conducted its initial public offering on April 17, 2014 (the "IPO").  In connection with the IPO, Defendants filed a prospectus (Form 424) with the SEC on April 17, 2014.  The prospectus provided investors with materially misleading information concerning the Company's ability to commercialize the ELAD System by representing that a success of either the VTI-208 study or the VTI-210 study would provide enough support for a BSA or MMA application.

31.    In pertinent part, the prospectus stated as follows:

7

We are currently enrolling patients in one Phase 3 clinical trial, and have regulatory allowance to begin enrolling patients in a second Phase 3 trial, each in forms of acute liver failure. In March 2013, we initiated VTI-208, a Phase 3 randomized, controlled clinical trial in 200 subjects with AILD. In addition, we have obtained regulatory allowance in the United States, United Kingdom, Spain and Australia to begin enrolling patients and have initiated clinical sites in a second Phase 3 randomized, controlled clinical trial, VTI-210, in 120 subjects with severe AAH, which is a subset of AILD. We expect the enrollment of subjects in VIT-210 to begin in the first half of 2014.

These studies are designed to complement each other and confirm study outcomes, and may be combined to support product registration in the United States and the European Union, or E.U. **In addition, based upon discussions with United States and European regulatory authorities, we believe the VTI-208 and VTI-210 clinical trials, if successful from both a statistical and clinical standpoint, may support product registration on a stand-alone basis.** According to the FDA, a second confirmatory clinical trial that substantiates positive results may be necessary to support a Biologics License Application, or BLA. EMA has informed us that the VTI-210 trial, if deemed successful, will be sufficient to support product registration in the E.U. We designed VTI-208 with input from the FDA to support product registration in the United States. Similarly, we designed VTI-201 with input from the EMA to support product registration in Europe. We currently anticipate having Phase 3 clinical trial data from VTI-208 in the first half of 2015.

32.   In a section titled "Our Strategy," Vital Therapies discussed its strategy to "becom[ing] the leading biotherapeutic company developing and marketing cell-based therapies targeting the treatment of acute liver failure."  One of the "[k]ey elements" of Vital Therapies' "strategy to achieve this goal" was the successful completion of either VTI-208 or VTI-210.  The prospectus stated, in pertinent part, as follows:

*Obtain regulatory approval for the ELAD System in the United States and Europe.* **If our VTI-208 or VTI-210 Phase 3 clinical trials are statistically and clinically successful, we plan to submit a BLA to the FDA and a Marketing Authorization Application, or an MAA, to the EMA, in 2016 for the indications of AILD and AAH, respectively**. If the Phase 2 and or Phase 3 component of VTI-212 provides compelling evidence of the safety and efficacy of the ELAD System in FHF and SILF we plan to seek agreement from the regulatory authorities regarding the next steps to be taken in order to

8

enable marketing authorization, which may or may not involve an additional randomized controlled Phase 3 clinical trial either prior to or after contingent marketing approval.

33.     The above statements, identified in bold-face, were false and/or materially misleading.   The statements were false and/or materially misleading because they misrepresented the Company's ability to successfully submit the BLA and/or MMA applications.   These misrepresentations were material because they provided investors with the false belief that the Company's clinical trials, if successful, could independently satisfy either the FDA or the EMA in terms of providing authority to commercialize the ELAD System.   Given the Company's critical dependence on the ELAD System, the truth concerning Vital Therapies' ability to receive authority to commercialize the ELAD System would have altered the total mix of information available to investors during the Class Period.

34.     The prospectus was part of the Company's amended registration statement, filed with the SEC on April 9, 2014 and signed by Defendants Winters and Swanson.   By way of the IPO, which was based upon the prospectus containing the false and/or materially misleading statements discussed above, Vital Therapies raised over $62 million in gross proceeds.

*October 3, 2014*

35.     Vital Therapies conducted a secondary offering on October 3, 2014 (the "Secondary Offering").   In connection with the Secondary Offering, Defendants filed a prospectus (Form 424) with the SEC on October 3, 2014.   The prospectus provided investors with materially misleading information concerning the Company's ability to commercialize the ELAD System by representing that a success of either the VTI-208 study or the VTI-210 study would provide enough support for a BSA or MMA application.

36.     In pertinent part, the prospectus stated as follows:

These studies [VTI-208 and VTI-210] are designed to complement each other and to confirm study outcomes, and the studies may be combined to support product registration in the

9

United States and the European Union, or EU. **In addition, based upon discussions with United States and European regulatory authorities, we believe each of the VTI-208 and VTI-210 clinical trials, if successful from both a statistical and clinical standpoint, may support product registration on a stand-alone basis**. According to the U.S. Food and Drug Administration, or FDA, a second confirmatory clinical trial that substantiates positive results may be necessary to support a Biologics License Application, or BLA. The EMA has informed us that the VTI-210 trial, if deemed successful, will be sufficient to support product registration in the EU. We designed VTI-208 with input from the FDA to support product registration in the United States. Similarly, we designed VTI-210 with input from the EMA to support product registration in the EU. We currently anticipate having Phase 3 clinical trial data from VTI-208 in the second quarter of 2015.

37.    In a section titled "Our Strategy," Vital Therapies discussed its strategy to "becom[ing] the leading biotherapeutic company developing and marketing cell-based therapies targeting the treatment of acute liver failure." One of the "[k]ey elements" of Vital Therapies' "strategy to achieve this goal" was the successful completion of either VTI-208 or VTI-210. The prospectus stated, in pertinent part, as follows:

> *Obtain regulatory approval for the ELAD System in the United States and Europe*. **If our VTI-208 or VTI-210 Phase 3 clinical trials are statistically and clinically successful, we plan to submit a BLA to the FDA and a Marketing Authorization Application, or an MAA, to the EMA, in 2016 or 2017 for the indications of AILD and AAH, respectively**. If the Phase 2 component of VTI-212 provides compelling evidence of the safety and efficacy of the ELAD System in FHF and SILF, we plan to seek agreement from the regulatory authorities regarding the next steps to be taken in order to enable marketing authorization, which may or may not involve an additional randomized controlled Phase 3 clinical trial either prior to or after contingent marketing approval.

38.    The above statements, identified in bold-face, were false and/or materially misleading. The statements were false and/or materially misleading because they misrepresented the Company's ability to successfully submit the BLA and/or MMA applications. These misrepresentations were material because they provided investors with the false belief that the Company's clinical trials, if

10

successful, could independently satisfy either the FDA or the EMA in terms of providing authority to commercialize the ELAD System.  Given the Company's critical dependence on the ELAD System, the truth concerning Vital Therapies' ability to receive authority to commercialize the ELAD System would have altered the total mix of information available to investors during the Class Period.

39.    The prospectus was part of the Company's amended registration statement, filed with the SEC on September 30, 2014 and signed by Defendants Winters and Swanson.  By way of the IPO, which was based upon the prospectus containing the false and/or materially misleading statements discussed above, Vital Therapies raised over $33 million in net proceeds.

### *March 19, 2015*

40.    On March 19, 2015, the Company hosted an investor conference call to discuss Vital Therapies' year-end results for fiscal 2014.

41.    During the conference call, Defendant Winters represented that the Company's VTI-210 study, by itself, would be sufficient to gain European approval for the ELAD System.  In pertinent part, Winters stated as follows:

> With respect to investor relations on the recommendation of our legal counsel we will not be discussing any aspect of the VTI-208 clinical trial with the public or the financial community outside of these prepared remarks until the top line results of the trial are announced. We will look forward to the trial results in the third quarter and we appreciate your understanding and respect for this policy. **Our second Phase III trial VTI-210 is a randomized controlled open label survival trial in severe acute alcoholic hepatitis patients, thereby suspect if this trial due to strong results it will be sufficient by itself to gain EU approval.**

42.    Similarly, Defendant Swanson also misled investors.   In pertinent part, Swanson stated as follows:

> Based on our current business plan our existing cash would fund our operations into the third quarter of 2016. This is a change from the fourth quarter of 2016 as our last projection reflecting higher expected

cost principally relating to preparations to file BLA in the events of positive VTI-208 results. However, if VTI-208 trial has good results and we proceed to file the BLA and begin to prepare for the future market launch, we would anticipate increasing our burn rate and raising additional funds. **If VTI-208 results do not support the BLA filing; we'd expect to focus on conserving cash in order to enable completion of the VTI-210 clinical trials**.

43.     The above statements, identified in bold-face, were false and/or materially misleading.  The statements were false and/or materially misleading because they misrepresented the Company's ability to successfully submit the BLA and/or MMA applications.  These misrepresentations were material because they provided investors with the false belief that the Company's clinical trials, if successful, could independently satisfy either the FDA or the EMA in terms of providing authority to commercialize the ELAD System.  Given the Company's critical dependence on the ELAD System, the truth concerning Vital Therapies' ability to receive authority to commercialize the ELAD System would have altered the total mix of information available to investors during the Class Period.

*March 20, 2015*

44.     On March 20, 2015, Vital Therapies filed its annual report (Form 10-K) with the SEC.  Defendant Winters signed the annual report on behalf of the Company.

45.     Vital Therapies' annual report, like its past prospectuses, provided investors with materially misleading information concerning the Company's ability to commercialize the ELAD System by representing that a success of either the VTI-208 study or the VTI-210 study would provide enough support for a BSA or MMA application.

46.     In pertinent part, the annual report stated as follows:

**The VTI-208 and VTI-210 clinical studies are designed to complement each other and to confirm study outcomes, and the studies may both be used to support product registration in the U.S. and the European Union, or EU**. We designed VTI-208 with input from the FDA to support product

12

registration in the U.S. **In addition, based upon discussions with the FDA, we believe the VTI-208 clinical study, if successful from both a statistical and clinical standpoint, may support product registration in the U.S. on a stand-alone basis**. However, according to the FDA, a second confirmatory clinical trial that substantiates positive results may be necessary to support a BLA. Similarly, we designed VTI-210 with input from the EMA to support product registration in the EU. **Based upon our discussions with the European regulatory authority, including communications with SAWP regarding subsequent modifications to the study protocol, we also believe VTI-210 may support on a stand-alone basis, if successful from both a statistical and clinical standpoint, product registration in the EU**.

47.   In a section titled "Our Strategy," Vital Therapies discussed its strategy to "becom[ing] the leading biotherapeutic company developing and marketing cell-based therapies targeting the treatment of acute liver failure." One of the "[k]ey elements" of Vital Therapies' "strategy to achieve this goal" was the successful completion of either VTI-208 or VTI-210. The prospectus stated, in pertinent part, as follows:

> *Obtain regulatory approval for the ELAD System in the U.S. and Europe*. **If our VTI-208 or VTI-210 Phase 3 clinical trials are statistically and clinically successful, we plan to submit a BLA to the FDA, and a Marketing Authorization Application, or an MAA, to the EMA, in 2016 or 2017 for the indications of AILD and SAAH, respectively**. If the Phase 2 component of VTI-212 provides compelling evidence of the safety and efficacy of the ELAD System in FHF and SILF, we plan to seek agreement from the regulatory authorities regarding the next steps to be taken in order to enable marketing authorization, which may or may not involve an additional randomized controlled Phase 3 clinical trial either prior to or after contingent marketing approval

48.   The annual report also described Vital Therapies' contingency plans for a failure of the VTI-208 trial, stating that "**If the VTI-208 clinical trial results do not support the filing of a BLA, we expect to focus on conserving cash in order to enable completion of the VTI-210 clinical trial**."

49.   The above statements, identified in bold-face, were false and/or materially misleading. The statements were false and/or materially misleading

13

1    because they misrepresented the Company's ability to successfully submit the

2    BLA and/or MMA applications.  These misrepresentations were material because

3    they provided investors with the false belief that the Company's clinical trials, if

4    successful, could independently satisfy either the FDA or the EMA in terms of

5    providing authority to commercialize the ELAD System.  Given the Company's

6    critical dependence on the ELAD System, the truth concerning Vital Therapies'

7    ability to receive authority to commercialize the ELAD System would have

8    altered the total mix of information available to investors during the Class Period.

9                                          *May 12, 2015*

10        50.    On May 12, 2015, Vital Therapies filed a quarterly disclosure report

11   (Form 10-Q) with the SEC.  Defendant Swanson signed the quarterly report on

12   behalf of the Company.

13        51.    The quarterly report provided investors with materially misleading

14   information concerning the Company's ability to commercialize the ELAD

15   System by representing that a success of either the VTI-208 study or the VTI-210

16   study would provide enough support for a BSA or MMA application.

17        52.    In pertinent part, the annual report stated as follows:

18        Based on our current business plan, we believe that our existing
         cash and cash equivalents as of March 31, 2015 will be
19       sufficient to fund our operations into the third quarter of 2016,
         assuming we do not begin building any significant commercial
20       infrastructure during the period. Under this plan, our existing
         cash and cash equivalents will be sufficient to fund development
21       through the receipt of topline results from our VTI-208 Phase 3
         clinical trial; however, we believe we will need additional funds
22       to complete enrollment in both our VTI-210 Phase 3 clinical
         trial and our VTI-212 Phase 2 clinical trial. However, if the
23       VTI-208 clinical trial is successful and we proceed to file a
         biologics license application, or BLA and to prepare for market
24       launch, we anticipate increasing our cash burn and raising
         additional funds. A decision to build commercial infrastructure
25       will be based on a variety of factors, most importantly the
         outcome of our clinical trials. **If the VTI-208 clinical trial**
26       **results do not support the filing of a BLA, we expect to focus**
         **on conserving cash in order to enable completion of the VTI-**
27       **210 clinical trial**. The amount and timing of our actual
         expenditures also depend on numerous factors, including the
28       rate of subject enrollment in our clinical trials, filing

                                             14

1  requirements with various regulatory agencies, and any unforeseen cash needs.

2  53.     Vital Therapies also hosted an investor conference call on May 12,

3  2015.   During the conference call, Defendant Winters continued to mislead

4  investors by providing them with materially misleading information concerning

5  the Company's ability to commercialize the ELAD System by representing that a

6  success of either the VTI-208 study or the VTI-210 study would provide enough

7  support for a BSA or MMA application.   In pertinent part, Winters stated in

8  response to an analyst question as follows:

9  **Katherine Xu**

10

11  Okay, thanks. And just you're playing on there with data with -- what
   if VTI-208 rate does not succeed, what is your back up plan there?

12

13  **Terry Winters**

14  Well, it is pretty difficult because it depends upon what comes out.
   **But obviously we would probably take a look at the data, decide**

15  **whether to file a BLA and if not we would put everything into**
   **VTI -210**. And we would probably make sure we had more than

16  adequate capital to make that happen.

17

18  54.     The above statements, identified in bold-face, were false and/or

19  materially misleading.   The statements were false and/or materially misleading

20  because they misrepresented the Company's ability to successfully submit the

21  BLA and/or MMA applications.   These misrepresentations were material because

22  they provided investors with the false belief that the Company's clinical trials, if

23  successful, could independently satisfy either the FDA or the EMA in terms of

24  providing authority to commercialize the ELAD System.   Given the Company's

25  critical dependence on the ELAD System, the truth concerning Vital Therapies'

26  ability to receive authority to commercialize the ELAD System would have

27  altered the total mix of information available to investors during the Class Period.

28

15

*July 30, 2015*

55.     On July 30, 2015, the Company held an investor conference call to discuss its operations during the second quarter of fiscal 2015.  During the call, Defendant Winters affirmed his and the Company's commitment towards proceeding with VTI-210 regardless of the outcome of VTI-208.  In pertinent part, Winters stated:

> We are all in this together. And lastly, we need to point out the VTI 208 is the first of two phase III clinical trials. Although we plan to file the Biologic License Application, or BLA, if the VTI 208 results are sufficiently positive, the results may or may not be good enough to support the filing of a BLA for marketing approval. **If they are not good enough for BLA filing, our current plan is to continue with our second phase III trial, VTI 210, possibly amended by whatever we learned from VTI 208**.

56.     The above statements, identified in bold-face, were false and/or materially misleading.  The statements were false and/or materially misleading because they misrepresented the Company's ability to successfully submit the BLA and/or MMA applications.  These misrepresentations were material because they provided investors with the false belief that the Company's clinical trials, if successful, could independently satisfy either the FDA or the EMA in terms of providing authority to commercialize the ELAD System.  Given the Company's critical dependence on the ELAD System, the truth concerning Vital Therapies' ability to receive authority to commercialize the ELAD System would have altered the total mix of information available to investors during the Class Period.

*August 6, 2015*

57.     On August 6, 2015, Vital Therapies filed a quarterly disclosure report (Form 10-Q) with the SEC.  Defendant Swanson signed the quarterly report on behalf of the Company.

58.    The quarterly report provided investors with materially misleading information concerning the Company's ability to commercialize the ELAD System by representing that a success of either the VTI-208 study or the VTI-210 study would provide enough support for a BSA or MMA application.

59.    In pertinent part, the annual report stated as follows:

> Based on our current business plan, we believe that our existing cash and cash equivalents as of June 30, 2015 will be sufficient to fund our operations into the third quarter of 2016, assuming we do not begin building any significant commercial infrastructure during the period. Under this plan, our existing cash and cash equivalents will be sufficient to fund development through the receipt of topline results from our VTI-208 Phase 3 clinical trial; however, we believe we will need additional funds to complete enrollment in both our VTI-210 Phase 3 clinical trial and our VTI-212 Phase 2 clinical trial. However, if the VTI-208 clinical trial is successful and we proceed to file a BLA and to prepare for market launch, we anticipate increasing our cash burn and raising additional funds. A decision to build commercial infrastructure will be based on a variety of factors, most importantly the outcome of our clinical trials. **If the VTI-208 clinical trial results do not support the filing of a BLA, we expect to focus on conserving cash in order to enable completion of the VTI-210 clinical trial**. The amount and timing of our actual expenditures also depends on numerous factors, including the rate of subject enrollment in our clinical trials, filing requirements with various regulatory agencies, and any unforeseen cash needs

60.    The above statements, identified in bold-face, were false and/or materially misleading.  The statements were false and/or materially misleading because they misrepresented the Company's ability to successfully submit the BLA and/or MMA applications.  These misrepresentations were material because they provided investors with the false belief that the Company's clinical trials, if successful, could independently satisfy either the FDA or the EMA in terms of providing authority to commercialize the ELAD System.  Given the Company's critical dependence on the ELAD System, the truth concerning Vital Therapies'

17

1 ability to receive authority to commercialize the ELAD System would have
2 altered the total mix of information available to investors during the Class Period.

3                            ***The Truth Is Revealed***

4                              <u>*August 21, 2015*</u>

5         61.     On August 21, 2015, after the market closed, the Company issued a
6 press release announcing that the VTI-208 trial "failed to meet the primary
7 endpoint of overall survival through at least 91 days[.]" The press release also
8 announced that "[t]he Company will stop the VTI-210 and VTI-212 clinical trials,
9 and also plans to meet with the FDA as soon as possible to discuss restructuring
10 its clinical development program, including a potential new trial to confirm the
11 information suggested by the subset analyses." In pertinent part, the press release
12 stated as follows:

13          **VITAL THERAPIES ANNOUNCES THAT TOPLINE**
14     **RESULTS OF VTI-208 FAIL TO ACHIEVE PRIMARY OR**
          **SECONDARY ENDPOINTS OF IMPROVEMENT IN**
15     **OVERALL SURVIVAL PRE-SPECIFIED EXPLORATORY**
16       **SUBSET ANALYSES SUGGEST EFFICACY TRENDS**

17     SAN DIEGO, August 21, 2015 (GLOBE NEWSWIRE) -- Vital
18     Therapies, Inc. (Nasdaq: VTL), a biotherapeutic company developing
       ELAD®, a cell-based therapy targeting the treatment of liver failure,
19     today announced that topline results from VTI-208, the Company's
20     phase 3 randomized, controlled, open-label trial, evaluating the ELAD
       System in subjects with alcohol-induced liver decompensation
21     (AILD) failed to meet the primary endpoint of overall survival
22     through at least 91 days assessed using the Kaplan Meier statistical
       method. Of 203 total subjects enrolled in VTI-208, 96 were
23     randomized to the treated group and 107 were randomized to the
24     control group. A hazard ratio of 1.027 (slightly favoring the control
       group) with a log rank p-value of 0.90 (not statistically significant,
25     N.S.) indicated that there was no difference between treated and
26     control subjects in the primary endpoint.

27     . . .

28
                                    18

The secondary endpoints of proportion of survivors at study days 28 and 91 also showed no difference between the groups (Pearson's Chi-squared p-values of 0.45 (N.S.) and 0.74 (N.S.), respectively).

The adverse event profile revealed that treatment emergent serious adverse events were similar between the treated and control groups in the predefined safety population.

. . .

The Company will be analyzing the data from the VTI-208 clinical trial during the next several weeks, including data from the pre-specified subset analyses. The Company will stop the VTI-210 and VTI-212 clinical trials, and also plans to meet with the FDA as soon as possible to discuss restructuring its clinical development program, including a potential new trial to confirm the information suggested by the subset analyses. The Company will then give more details on a possible path forward with ELAD.

While the overall results are disappointing, the Company is encouraged that a large pre-specified subset of 120 subjects with a MELD score of less than 28 had a hazard ratio of 0.575 and a log-rank p-value of 0.077 (N.S.) in favor of the ELAD group, suggesting that future clinical studies should focus on this cohort with MELD scores less than 28. Separately, a pre-specified subset of 101 subjects under age 46.9 years (the study median age) had a hazard ratio of 0.634 with a log-rank p-value of 0.167 (N.S.) in favor of the ELAD treated subjects, suggesting that future study designs may incorporate stratification by age. Indeed these effects appear to be additive and a subset of 59 subjects with MELD less than 28 and age less than 46.9 years had a hazard ratio of 0.375 in favor of the ELAD group (p=0.085). Finally, pre-specified analyses suggest that subjects with impaired kidney function and severe coagulopathy may have worse outcomes and therefore future clinical trials will exclude these subjects.

With $62.0 million in current cash, the Company believes it could complete a new trial without raising additional capital, although that will depend on discussions with regulatory authorities and the exact design of any new trial.

62.    On the same day, the Company held a conference call to discuss the VTI-208 results and the future of Vital Therapies.[1] During the call, Defendant Winters explained that the Company's other trials would be stopped to conserve cash for a new trial. When asked when the VTI-210 and VTI-212 trials would be restarted, Winters refused to give a time frame.

63.    The VTI-208 results revealed that ELAD did not result in any survival benefit.  Analysts and investors took note of this.  For example, equity research firm BTIG noted in a report dated August 24, 2015, "The big surprise to us was that there was no survival benefit.  We thought if the trial missed its endpoint it would trend towards a benefit, without being statistically significant. In this case, no benefit was seen. It seems the control group did better than we would have expected, but we do not have a good reason that there was absolutely no benefit seen."  Similarly,

64.    As a result of this news, the trading price of Vital Therapies common stock plunged 73.4% from its August 21, 2015 closing price of $17.68 per share to close at $3.65 per share on August 24, 2015, the next trading day.

### Subsequent Class Period Disclosures

### September 28, 2015

65.    Vital Therapies issued a press release on September 28, 2015.  The press release outlined the patient inclusion/exclusion criteria for an upcoming study designed to test the efficacy and safety of the ELAD device.

66.    According to the press release, the new study, VTL-308, would "exclude[] subjects 50 years and older and also those with creatinine 1.3 mg/dL and above and INR above 2.5, in an attempt to avoid subjects with significant kidney and blood clotting dysfunction. In accord with this analysis, the 91-day survival rates were 93.9% for ELAD-treated subjects and 68.4% for controls (N=71; Pearson's Chi-squared P < 0.05)."

---

[1] Available at http://edge.media-server.com/m/p/vqthdvoz (accessed on October 30, 2015).

1

*November 5, 2015*

2  67. Defendant Winters elaborated on the proposed protocol for VTL-308

3 during the Company's investors conference call held on November 5, 2015.  With

4 respect to the patient population for the new study, Winters explained that VTL-

5 308 would essentially involve a healthier sample.

6  68. Winters stated, in pertinent part, as follows:

7

8 Our recent news release described the post-hoc subset analysis of 60
VTI-208 subjects with these optical limits that would have shown

9 statistical significance in the VTI-208 trial has subset being pre-
specified. We intend to use the parameters of this subset as the basis

10 of a proposed new Phase III trial to record VTL-308.

11

12 We have let the data guide us to this population whose key limits are:
age, less than 50 years, MELD score less than 30, creatinine less than

13 1.3 mg/dL, international normalization ratio or INR less than or equal
to 2.5 and bilirubin greater than or equal to 16 mg/dL.

14

15 As previously reported here are several functions for this 60 subject
post-hoc subset. The overall survival through at least 91 days on a

16 Kaplan-Meier basis showed a p-value of less than 0.01 and a hazard
ratio of 0.28. To see a copy of the Kaplan-Meier curve please refer to

17 our October 16 news release.

18

19 91 day survival in this subset was 93% for the ELAD group versus
61% for those treated only with standard-of-care. The p-value was

20 0.01 on a Pearson's Chi-squared basis. And the survival benefit
appeared durable with survival at the end of 180 days of 89% for the

21 ELAD group versus 48% in those treated only with standard-of-care.
Again on a Pearson's Chi-squared basis the p-value was less than 0.01.

22

23 Although the results of this post-hoc analysis showed statistical

24 significance, it was not pre-specified and there is no guarantee that the
results of the planned VTL-308 Phase III trial will replicate the results

25 of this subset. We are continuing our analyses of the VTI-208 data

26 particularly with respect to further defining ELAD's mechanism, of
action. We look forward to sharing any additional data with you when

27 it becomes available.

28

***Defendants Acted with Scienter***

69.    Defendants represented throughout the Class Period that the Company's ability to secure commercialization could be solidified through either the VTI-208 or VTI-210 study.  In other words, Defendants told investors that commercialization could be obtained through one of two routes, thus offering investors with a sense of increased security in their investments.

70.    Defendants acted with scienter when making these statements. Between 2006 and 2011, Vital Therapies conducted at least three other studies— "VTIC-301", "VTI-201", and "VTI-206".   None of these studies yielded statistically significant positive results.  In fact, the only time the ELAD System demonstrated any kind of statistically significant clinical benefit was in a viral hepatitis trial conducted on 68 subjects in China (VTIC-301), and even then only on one out of four of the study's endpoints.  The most recent study prior to VTI-208 was VTI-206, which was terminated ahead of schedule and showed that the control group (non-ELAD System) had better survival rates than the treatment group (ELAD System).   VTI-208 is markedly similar to VTI-206, involving almost identical populations for study participants.

71.    The most recent studies—VTI-208 and VTI-210—were just as unlikely to produce positive results as well, and Defendants knew this. Throughout the VTI-208 study, clinical researches reported significant problems with quality control measures that were materially impacting the various testing sites.   At least half of the testing sites involved in the VTI-208 study were deficient in terms of the expertise of the staff and their operation of the trial. Moreover, site investigators were underreporting adverse event occurrences.  Re-training was required at a number of the test sites.  The quality control issues were made known to the investigators, clinical research associates, senior management,

1   and Winters, who attempted to remediate the issues by replacing certain clinical

2   staff with more qualified investigators.

3        72.   In addition, Vital Therapies also attempted to suppress or ignore the

4   adverse event occurrences.   Moreover, Vital Therapies kept its quality control

5   staff separated from clinical team meetings.   Vital Therapies attempted to hide the

6   adverse event occurrences in an effort to avoid disclosing it to the FDA if and

7   when the data was submitted in support of its application for commercialization.

8        73.   Furthermore, even before commencing the VTI-208 study, the FDA

9   expressed its view that Vital Therapies' "clinical evidence" to date "[did] not

10  indicate that the ELAD System [would] demonstrate a substantial improvement

11  over standard-of-care."   Moreover, the FDA had already expressed concern over

12  "the open-label design of study VTI-208" and "issues that could significantly

13  confound the study results, impact morbidity and mortality and cause the FDA or

14  other regulatory authorities to require [Vital Therapies to] repeat clinical trials

15  with different trial designs."   Notwithstanding the Company's numerous past

16  failures and stated concerns from the FDA, Defendants recklessly provided

17  investors with a false and/or materially misleading overview of the Company's

18  ability to commercialize the ELAD System.

19       74.   Winters, in particular, was had reason to act with recklessness.

20  Having joined the Company in June 2003 as Chairman of its Board of Directors,

21  Winters was especially invested in the outcome of the ELAD System clinical

22  trials.   Vital Therapies "restarted" its clinical program in the United States and

23  Europe in 2008. Since then, Winters oversaw three clinical trials with no success,

24  costing the Company millions of dollars in the interim (*i.e.*, $180 million

25  accumulated deficit as of June 30, 2015).   As a result of the vast amount of time

26  and resources already invested into the ELAD System clinical trials, Winters had

27  motive to mislead investors with respect to the Company's prospects for

28  commercialization in hopes that the benefits would exceed the costs.

75.   Winters' knowledge of ongoing quality control issues directly contradicts his statements during the Class Period concerning Vital Therapies' ability to secure commercialization based on the results of only one clinical study. Upon review of the study's process and procedures, the FDA would have denied the Company's BLA and required additional testing to eliminate any concerns stemming from the quality control issues.   That, together with his personal motives for wanting to proceed with filing the BLA and MMA, support a strong inference with respect to Winters.

### *Loss Causation*

76.   During the Class Period, as detailed herein, the Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the trading price of Vital Therapies' common stock and operated as a fraud or deceit on Class Period purchasers of Vital Therapies common stock by materially misleading the investing public.

77.   Later, when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the trading price of Vital Therapies common stock fell precipitously, as the prior artificial inflation came out of the price over time.

78.   As a result of their purchases of Vital Therapies' common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### *Presumption of Reliance: Fraud-On-The-Market Doctrine*

79.   At all relevant times, the market for Vital Therapies' common stock was an efficient market for the following reasons, among others:

(a)   Vital Therapies common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    Vital Therapies filed periodic public reports with the SEC and NASDAQ;

(c)    Vital Therapies regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    Material news about Vital Therapies was reflected in an incorporated into the Company's stock price during the Class Period.

80.    As a result of the foregoing, the market for Vital Therapies' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Vital Therapies common stock during the Class Period suffered similar injury through their purchase of Company stock at artificially inflated prices and a presumption of reliance applies.

81.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**NO SAFE HARBOR; BESPEAKS CAUTION DOCTRINE DOES NOT APPLY**

82.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

83.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

84.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Vital Therapies who knew that the "forward-looking statement" was false.  Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**CLASS ACTION ALLEGATIONS**

85.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Vital Therapies common stock during the Class Period. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate

26

1  families and their legal representatives, heirs, successors, or assigns, and any
2  entity in which Defendants have or had a controlling interest.

3    86.    The members of the Class are so numerous that joinder of all
4  members is impracticable, since Vital Therapies has millions of shares of stock
5  outstanding and because the Company's shares were actively traded on the
6  NASDAQ.   As of April 30, 2016, Vital Therapies had more than 31.2 million
7  shares issued and outstanding.   While the exact number of Class members is
8  unknown to Lead Plaintiff at this time and can only be ascertained through
9  appropriate discovery, Lead Plaintiff believes that there are thousands of members
10 in the proposed Class and that they are geographically dispersed.

11    87.    There is a well-defined community of interest in the questions of law
12 and fact involved in this case. Questions of law and fact common to the members
13 of the Class which predominate over questions which may affect individual Class
14 and Private Placement Class members include:

15    (a)    whether the Exchange Act was violated by Defendants;
16    (b)     whether Defendants omitted and/or misrepresented material
17           facts in their publicly disseminated press releases and
18           statements during the Class Period;
19    (c)    whether Defendants' statements omitted material facts
20           necessary to make the statements made, in light of the
21           circumstances under which they were made, not misleading;
22    (d)    whether Defendants participated and pursued the fraudulent
23           scheme or course of business complained of herein;
24    (e)    whether Defendants acted willfully, with knowledge or
25           recklessly in omitting and/or misrepresenting material facts;
26    (f)    whether the price of Vital Therapies common stock was
27           artificially inflated during the Class Period as a result of the
28

27

material nondisclosures and/or misrepresentations complained of herein; and

(g)   whether the members of the Class have sustained damages as a result of the decline in value of Vital Therapies' stock when the truth was revealed, and if so, what is the appropriate measure of damages.

88.   Lead Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

89.   Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

90.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

*(Violation of Section 10(b) and Rule 10b-5 against Defendants)*

91.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (2) cause Lead Plaintiff and other members of the Class to purchase Vital Therapies' common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

93.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts

28

necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vital Therapies' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

94.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Vital Therapies as specified herein.

95.     Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Vital Therapies' value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Vital Therapies and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Vital Therapies' common stock during the Class Period.

96.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vital Therapies' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its

securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial and operational condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

97.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vital Therapies' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Energy for Vital Therapies' publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Vital Therapies' securities during the Class Period at artificially high prices and were or will be damaged thereby.

98.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding Vital Therapies' financial results, which was not disclosed by Vital Therapies, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Vital Therapies' common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

99.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

100.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

101.   This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

*(Violation of Section 20(a) Against Winters and Swanson)*

102.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.   Winters and Swanson acted as controlling persons of Vital Therapies within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Winters and Swanson had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.  Winters and Swanson were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

104.   In particular, Winters and Swanson had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

105.   As set forth above, Vital Therapies violated Section 10(b), and Rule 10b-5 promulgated thereunder, by its acts and omissions as alleged in this Complaint.

106.   By virtue of their positions as controlling persons, Winters and Swanson are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Winters' and Swanson's wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

107.   This action was filed within two years of discovery of the fraud and within five years of each Lead Plaintiff's purchases of securities giving rise to the cause of action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

(b)   Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

1        (d)      Such other and further relief as the Court may deem just and proper.

2                     **<u>JURY TRIAL DEMANDED</u>**

3      Plaintiff hereby demands a trial by jury.

Dated:  June 1, 2016           Respectfully submitted,

LEVI & KORSINSKY, LLP

/s/ Adam C. McCall
Adam C. McCall (SBN 302130)
Email: amccall@zlk.com
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel:  (213) 985-7290

*and*

Nicholas I. Porritt
Adam M. Apton
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel:   (202) 524-4290
Fax:   (202) 333-2121
(*pro hac vice applications to be submitted*)

*Attorneys for Lead Plaintiff Kaktrale Austin
and Lead Counsel for the Class*

33

## CERTIFICATE OF SERVICE

I, Adam C. McCall, hereby declare under penalty of perjury as follows:

On June 1, 2016, I electronically filed the foregoing amended complaint with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on June 1, 2016.


/s/ Adam C. McCall
Adam C. McCall